No. 24-40799

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ANTONIO CASTRO-MENDEZ,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

---

# BRIEF FOR APPELLANT

---

PHILIP G. GALLAGHER
Federal Public Defender
Southern District of Texas

EVAN G. HOWZE
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002
(713) 718-4600

# CERTIFICATE OF INTERESTED PERSONS

United States v. Antonio Castro-Mendez,
No. 24-40799

So the judges of this Court may evaluate possible disqualification or recusal, counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case:

1. District Judges: Hon. Nelva Gonzales Ramos
2. Magistrate Judges: Hon. Hon. Julie K. Hampton and Hon. Jason B. Libby
3. Appellant: Antonio Castro-Mendez
4. Appellant's Counsel: Federal Public Defender Philip G. Gallagher; and Assistant Federal Public Defenders Rachel E. Braver and Evan G. Howze
5. Appellee: United States of America
6. Appellee's Counsel: United States Attorney Nicholas J. Ganjei; and Assistant United States Attorneys Joseph F. Griffith and Yasmine K. Tucker

s/ *Evan G. Howze*
EVAN G. HOWZE

## REQUEST FOR ORAL ARGUMENT

Mr. Castro-Mendez requests oral argument. This case presents two important issues regarding the constitutionality of law enforcement reliance on trained detector dogs at interior immigration checkpoints. Counsel accordingly believes that oral discussion of the record and relevant binding and persuasive authorities would benefit the Court.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ........ ii

Request for Oral Argument ........ iii

Table of Citations ........ vi

Statement of Jurisdiction ........ 1

Statement of the Issues ........ 2

Statement of the Case ........ 2

Summary of the Argument ........ 13

Argument ........ 15

I. The district court erroneously denied suppression because the detector dog, Fit, physically intruded onto Mr. Castro-Mendez's truck prior to the onset of probable cause, and the intrusion's information-gathering purpose made it a Fourth Amendment search ........ 15

A. Review is de novo ........ 15

B. Fit's trespass preceded probable cause and amounted to a search ........ 15

1. Fit trespassed before probable cause had arisen ........ 16

2. Fit's trespasses were searches because they had an investigative, information-gathering purpose ........ 19

II. Alternatively, the district court erred in denying suppression because Fit's training as a Border Patrol detector dog leads her to respond to the odor of lawful activity, and that rendered her sniff an unlawful "search" from the outset ........ 25

A. Review is de novo ........ 25

## TABLE OF CONTENTS – (cont'd)

**Page**

B. Fit's sniff was a search because, by virtue of her training, it is no longer uniquely limited to disclosing the presence or absence of unlawful activity ....... 25

Conclusion ....... 30

Certificate of Service ....... 31

Certificate of Compliance ....... 31

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Florida v. Harris*, 568 U.S. 237 (2013) .......... 26

*Florida v. Jardines*, 569 U.S. 1 (2013) .......... 15-6, 19-22, 24

*Illinois v. Caballes*, 543 U.S. 405 (2005) .......... 26-27

*Illinois v. Gates*, 462 U.S. 213 (1983) .......... 25-26

*Katz v. United States*, 389 U.S. 347 (1967) .......... 15

*Ornelas v. United States*, 517 U.S. 690 (1996) .......... 15, 25

*People v. McKnight*, 446 P.3d 397 (Colo. 2019) .......... 27-28

*State v. Howard*, 496 P.3d 865 (Idaho 2021) .......... 22-23

*State v. Organ*, 726 S.W.3d 346 (Tex. Crim. App. 2025) .......... 22

*United States v. Dovali-Avila*, 895 F.2d 206 (5th Cir. 1990) .......... 17

*United States v. Jones*, 565 U.S. 400 (2012) .......... 15, 19-20, 24

*United States v. Keller*, 123 F.4th 264 (5th Cir. 2024) .......... 7, 17-18, 20-21, 26-27, 29

*United States v. Martinez*, 102 F.4th 677 (5th Cir. 2024) .......... 7, 17-18, 28-29

*United States v. Place*, 462 U.S. 696 (1983) .......... 26-27

*United States v. Richmond*, 915 F.3d 352 (5th Cir. 2019) .......... 19-20

## TABLE OF CITATIONS – (cont'd)

**Page(s)**

### Cases – (cont'd)

*United States v. Rivas*, 157 F.3d 364
(5th Cir. 1998) .......... 18

*United States v. Wright*, 57 F.4th 524
(5th Cir. 2023) .......... 15, 25

### Statutes and Rules

8 U.S.C. § 1324(a)(1)(A)(ii) .......... 5

18 U.S.C. § 922(g)(1) .......... 5

18 U.S.C. § 3742 .......... 1

28 U.S.C. § 1291 .......... 1

Fed. R. App. P. 4(b)(1) .......... 1

5th Cir. R. 28.2.1 .......... ii

## STATEMENT OF JURISDICTION

The United States District Court for the Southern District of Texas entered judgment of conviction and sentence on December 12, 2024. Mr. Castro-Mendez timely filed notice of appeal the same day. *See* Fed. R. App. P. 4(b)(1). This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

***Issue One*:** Whether the detector dog's physical intrusion onto Mr. Castro-Mendez's truck preceded the onset of probable cause and had the information-gathering purpose necessary to effect a trespassory search under the Fourth Amendment.

***Issue two*:** Whether, by virtue of the fact that she is trained to respond even to the odor of nonvisible lawful passengers, Fit's sniff was itself an unlawful search.

## STATEMENT OF THE CASE

***The sniff in primary***. In January of 2024, Antonio Castro-Mendez drove a pickup truck into the U.S. Customs and Border Protection interior checkpoint in Falfurrias, Texas. ROA.300. The truck's bed had an attached, flat, and locked hard cover. ROA.357. During immigration inspection, CBP Agent Mario Vera and his canine-officer companion, Fit, approached the truck from the rear so that Fit could perform an investigatory free-air sniff outside the vehicle. ROA.300. Fit's entire interaction with the truck in the primary inspection lane was captured on video-surveillance footage. Government's Exhibit (GE) 1 at 00:00:15–00:00:56.

The video shows Fit—all the while sniffing—approach the tailgate and continue to walk parallel to the bed (on the driver's side) until reaching the seam separating the passenger compartment from the bed, at which point she stops and turns so as to lead Agent Vera back towards the bed. GE 1 at 00:00:23–00:00:30. Almost immediately upon turning, Fit pauses at the rear wheel-well, where she then slowly rises to stand on her hind legs—placing both forepaws physically on the rear tire so

as to hold herself up—and sniffs the bed from that more-elevated position. ROA.158, 224-25; GE 1 at 00:00:27–00:00:31. Here is a still shot of what that looked like: GE 1 at 00:00:31 (cropped).



After sniffing at that vantage point for no more than two seconds, Fit returns to ground-level and leads Agent Vera to the truck's tailgate, where she rises to stand again—this time placing both forepaws on the rear bumper—and continues to sniff

for five or so more seconds. ROA.158-59; GE 1 at 00:00:32–00:00:41. As this happens, Agent Vera can be seen signaling the (unidentified) primary-inspection agent to refer the truck to "secondary" inspection. ROA.158, 160; GE 1 at 00:00:41. The truck's arrival at secondary, and various agents' follow-on investigation of the vehicle, was also captured on surveillance video. *See* Government's Exhibit (GE) 2 at 0:00:10–0:08:40.

***The search, its fruit, and the indictment***. At secondary, Agent Rene Duenas informed Mr. Castro-Mendez that he owed his referral to secondary to a "K-9 alert" and asked if he had any weapons in the vehicle, to which Mr. Castro-Mendez responded by indicating that he had a pistol in the center console. ROA.236-37. Agent Duenas then entered the truck's cab and retrieved the firearm and five rounds of ammunition. ROA.237. About four minutes later, Agent Vera physically searched the truck's bed by lifting up the attached cover just enough to "take a peek" underneath. ROA.161; GE 2 at 0:05:15–0:05:24. He saw four individuals huddled and laying down in the bed. ROA.161. Those people were detained, and Mr. Castro-Mendez was arrested. ROA.14, 222.

In a post-arrest interview, Mr. Castro-Mendez admitted that the pistol and ammunition belonged to him. ROA.301. Further investigation revealed that the firearm had been manufactured in another state; that, in 2018, Mr. Castro-Mendez had been convicted of the Texas felony offense of intoxicated assault; and that the hidden passengers were undocumented Guatemalan citizens. ROA.301, 305, 307, 357, 368-73.

These facts led to an indictment charging Mr. Castro-Mendez with transporting two of the four undocumented persons within the United States (counts 1 and 2), 8 U.S.C. § 1324(a)(1)(A)(ii), and possessing a firearm and ammunition as a felon (count 3), 18 U.S.C. § 922(g)(1). ROA.24-25.

***The motion to suppress***. Mr. Castro-Mendez moved to suppress all the evidence gained as a result of the primary and secondary inspections, on three grounds. ROA.44-53. First, he argued that Fit's sniff was itself a Fourth Amendment search because, like all Border Patrol detector dogs, she is trained to alert not only to contraband substances but also to the odor of nonvisible humans, and so will react to the scent of even lawfully present humans she simply cannot see. ROA.46-47. Because the sniff-search preceded any cause to suspect illegality, he maintained, it warranted suppression. ROA.46-47.

Second, Mr. Castro-Mendez argued that even if the sniff did not invade a Fourth Amendment privacy interest, the fact that Fit physically trespassed on the truck by climbing up on the tire and bumper, with the apparent aim of gaining an elevated vantage point from which to sniff, invaded a Fourth Amendment property interest. ROA.47-49. This argument dovetailed with the third, in which Mr. Castro-Mendez maintained that Fit's actions during the primary inspection did not suffice to generate probable cause to search either before, or after, the trespasses. ROA.49-50. Accordingly, he argued that suppression was alternatively warranted because probable cause had not developed as of either the point at which Fit initially touched

the vehicle, or, even if that trespass was not a search, as of the human search that happened as soon as the vehicle hit secondary. ROA.49-50.

***The suppression hearing***. At a formal suppression hearing, and as pertinent here, the government admitted without objection (ROA.147) the two video-footage excerpts of Mr. Castro-Mendez's time in the primary and secondary inspection areas (GEs 1 and 2), as well as records demonstrating that Agent Vera and Fit had been certified in December 2022, and recertified in November 2023, "in the detection of concealed humans and the odors of" several controlled substances and their derivatives. ROA.332-333 (GEs 3 and 4). All the testimony pertinent to the issues on appeal came in through Agent Vera. *See generally* ROA.148-228.

***Fit's training***. Agent Vera detailed the handler-certification process, explained that he had been with Fit ever since becoming certified (about 13 months, as of the checkpoint encounter at issue here), and confirmed that he and Fit are required to do eight hours' maintenance training each fortnight. ROA.149-52. Agent Vera also confirmed that he and Fit are trained consistent with the unique parlance Border Patrol has developed for distinguishing among the stages of the typical behavioral sequence that occurs when a CBP-trained dog encounters an odor it is conditioned to detect. ROA.152-54, 224-25. That sequence consists of "three different behaviors": "alert," followed by "tracing," and then "indication." ROA.153; *see* ROA.224 (agreeing that Fit's "typical" sequence is to "alert[], trace, then indicate").

Consistent with what Border Patrol agents and experts have testified in other recent cases,[1] Agent Vera testified that, under the CBP's rubric, the term "alert" refers to the "change in body posture, [and] increased [rate of] respiration" that manifests "when the dog first encounters an odor it's trained to detect." ROA.153. The "combination of instinctual behaviors" that comprises an "alert," Agent Vera explained, is "unique" to each detector dog and, as such, cannot be trained. ROA.153, 168-70. For instance, based on his time with Fit, Agent Vera described her alert behavior as follows: "her ears perk up and down, and she closes her mouth, and she's taking deep breaths, and then her head stiffens." ROA.155.

"Tracing," in contrast, "is a post-alert behavior" that the dog undertakes in an effort to "follow[]" and ultimately "find the source" of the detected odor. ROA.153, 224. Finally, in the Border Patrol's vernacular, the term "indication" refers to the "behavior" a particular dog is "trained" to perform once it "pinpoints [the] source," from within the vehicle, of an odor it has alerted to and traced to that location. ROA.153. Fit, Agent Vera explained, is trained to indicate by sitting; but she will sometimes "[lay] down, [or] point," "depend[ing] on where the source [of the odor she has detected] is coming from." ROA.168.

When cross-examined on Fit's training vis-à-vis human odor, Agent Vera clarified that when he says Fit "is trained to alert and indicate to" the scent of "concealed

[1] *See United States v. Keller*, 123 F.4th 264, 266 & n.1 (5th Cir. 2024); *United States v. Martinez*, 102 F.4th 677, 682 (5th Cir. 2024).

persons," he is referring to anyone inside a vehicle who is "hidden from [the] view [of] the dog"—i.e., "humans that the dog cannot see." ROA.188-89. Agent Vera also confirmed that this means that, because Fit and dogs trained like her are conditioned to ignore humans that are "visible to the[m]," they "will alert" to the presence of "a human in the car that the dog cannot see"—irrespective of the human's nationality, immigration status, or involvement in criminal activity. ROA.189, 192-93. And he confirmed that the alert or indication of Fit and other dogs trained to react to non-visible humans can accordingly signal the mere presence of "a baby in a car seat," "somebody taking a nap in the back seat," or anybody else who is obscured from the dog's view. ROA.190; *see* ROA.192 (Q: "So, if there's a person in the back seat who the dog can't see, the dog's going to alert?" A: "Yes."). Agent Vera further agreed that, so long as they are U.S. citizens, "there's nothing illegal about" the presence of the individuals whose scent he admitted will cause a dog trained like Fit to alert and indicate to in each of these examples. ROA.192-93. Agent Vera accordingly conceded that, because "she'll alert to people she can't see, concealed humans to her," Fit's alert and indication, on their own, may signal "legal activity." ROA.193.

***Fit's investigatory sniff, alerts, and off-camera indication***. Referring to the GE 1 video footage, Agent Vera explained that he interpreted Fit to have exhibited her instinctive "alert" posture and breathing "twice prior to touching" Mr. Castro-Mendez's truck: first, "when[] she reached the first seam with the tailgate" as they approached from the truck's rear; and, second, at the seam "between the cab and the

bed of the truck"—i.e., just before Fit did the "little circle spin" to turn and lead the agent back towards the bed area. ROA.158-59; *accord* ROA.224-25 (confirming this sequence). Agent Vera testified that he understood this to mean that Fit had detected one of her trained odors, and that everything Fit did from the "circle spin" onward—including using the rear tire and bumper to hold herself up to sniff the bed—was part of her "post-alert" endeavor to "trace" the odor to its source and, thereby, obtain the reward (a toy) she is conditioned to expect upon alerting and sometimes, though not always, indicating.[2] ROA.158-59, 200-02, 205, 224-25. Agent Vera also testified that Fit in fact performed her trained indication—she sat—when they returned to the back of the tailgate (after she lifted herself up on the rear tire and rear bumper) while in the primary lane. ROA.158-59, 208-09, 225. Because of the angle of the surveillance camera, however, the vehicle obscured that indication-behavior from view. ROA.159, 208-09, 225.

***The trespasses in between***. On direct examination, when asked "what information was gained when Fit jumped up on the[] tire" and "[w]hat information was gained when she jumped on the[] bumper," Agent Vera answered that "there was no information gained" both times. ROA.158-59. It is not clear, given the use of passive voice in both the prosecutor's questions and the agent's answers, whether Agent Vera

[2] Agent Vera testified that, in training, he will reward Fit only if she has correctly alerted *and* performed her trained indication. ROA.180. At the checkpoint, however, he "will reward" Fit if she only alerts, but fails to indicate, depending on his perception as to whether she was prevented from getting close enough to the alerted-to odor's source. ROA.180-83.

meant to confirm that *he* gained no additional information from the trespasses, or instead meant to speculate that *Fit* gained no new information. But context provided by subsequent testimony and argument at the hearing revealed it to be the former. Agent Vera later confirmed that he believed he already had all the information necessary to extend the detention when he testified that he operates on the assumption that Fit's "alert is w[hat] gives me probable cause to secondary [a] vehicle," and that he accordingly will signal for referral to secondary "[w]henever she alerts"—even if she never indicates. ROA.183. And, the trial prosecutor confirmed the aim of her questions and import of the agent's answers on this topic when, in explicating the government's position on the trespass issue, she stressed that "Agent Vera testified that when Fit touched the tire and the bumper, *he* gained no information," and that this was because the "alert was already there before" the physical contacts. ROA.260 (emphasis added).

In any case, when pressed for further explanation and clarification on cross and redirect, Agent Vera confirmed (1) that the purpose of Fit's "post-alert" behavior is to gather more olfactory information so she can identify and indicate at the alerted-to odor's source, and (2) that, as noted above, both trespasses on Mr. Castro-Mendez's truck were part of that investigative effort. ROA.200-02, 205, 224-25. Specifically, Agent Vera explained that, after displaying the instinctive posture and breathing change that CBP classifies as becoming "alert" to an odor, Fit switched to the "post-alert," "tracing" behavior that is meant to culminate in an "indication" at the

odor's source. ROA.224-25. Agent Vera also confirmed that both when Fit elevated herself by physically placing her forepaws "on the tire," and then "on the bumper," she was "continuing to do her job"—in that "she [wa]s continuing to sniff" various areas of the vehicle so as to discern whether the alerted-to odor was emanating more or less powerfully at those locations. ROA.200-01, 205. And Agent Vera further testified that Fit uses that information to "pinpoint" and "get as close as possible" to the source of the odor so she can convey that finding to her handler by performing her trained indication (and, in turn, receive her toy). ROA.200-02, 224-25.

***The district court's ruling***. At the close of evidence, Mr. Castro-Mendez renewed the suppression arguments pressed in his pleadings. *See* ROA.244-59. After taking the matter under advisement, the district court denied the motion to suppress in a written order. ROA.81-92.

As pertinent here, the court first held that Fit's sniff itself did not rise to the level of a search, notwithstanding the fact that her training leads her to alert and indicate to even to the odor of lawfully present passengers, because her use in this particular case in fact "did not expose or reveal any noncontraband items." ROA.86; *see* ROA.84-88. The court further found it unnecessary to decide whether Fit's physical intrusions on the truck's rear tire and bumper constituted a trespassory search because, in the court's view, Agent Vera had credibly testified that he observed Fit's instinctive "alert" behavior before she ever touched the tire. ROA.88-90. Operating on the assumption that this type of "alert" alone sufficed to generate probable cause,

the court concluded that Fit's trespasses would have been reasonable even if they amounted to searches. ROA.90-92.

***The conditional plea and sentence***. Mr. Castro-Mendez pleaded guilty conditionally, pursuant to a plea agreement reserving his right to appeal only the adverse suppression ruling, to the felon-in-possession count (count 3). ROA.103-14, 310. The district court later sentenced Mr. Castro-Mendez to 18 months' imprisonment, followed by two years of supervised release. ROA.326. This timely appeal followed. ROA.128-29.

## SUMMARY OF THE ARGUMENT

For either of two alternative reasons, the district court erroneously denied Mr. Castro-Mendez's motion to suppress the fruit of Fit's investigatory sniff as obtained in violation of the Fourth Amendment.

**I.** After becoming "alert" to a trained odor, but before performing her trained "indication" behavior at the odor's perceived source, Fit trespassed on Mr. Castro-Mendez's truck by placing her paws on the rear tire, and then the rear bumper, so as to effectively maintain a standing position and thereby sniff the bed at that elevated vantage point. Agent Vera, Fit's handler, made clear that the intrusion had an investigative purpose: Fit was in the process of gathering the olfactory information she needed to discern the alerted-to odor's strongest source from within the vehicle, so she could then indicate that location to the agent. As such, the trespass amounted to a search. And, given that the sole basis for suspecting Mr. Castro-Mendez of wrongdoing at the time was Fit's mere instinctive change in body posture and breathing that CBP peculiarly labels an "alert," as distinguished from her trained "indication," that search unreasonably preceded probable cause.

**II.** Fit is well trained. But that training teaches her to alert to and indicate at the source of nonvisible-human odor. As Agent Vera unequivocally testified, that means Fit will alert—correctly, under her training—even to the scent of lawfully present passengers she can't see. So, although reliable, Fit lacks the essential, *sui generis* quality underpinning the Supreme Court's rationale for holding that the non-

trespassory sniff of a well-trained detector dog is not a search—unlike the dogs in *Place*, *Caballes*, and *Harris*, Fit's sniff is not limited to detecting, and thus revealing, the presence or absence of *unlawful* activity. Even at an interior immigration checkpoint, the lawfully present occupants of a vehicle possess a reasonable expectation that their personal belongings and closed containers inside the car will not be subject to official inspection merely because the dog who sniffed the vehicle could not see them. Because it may reveal the presence of odor connected to purely lawful activity, Fit's sniff invades a constitutionally cognizable privacy interest and was therefore a search. Because that search also preceded probable cause, it, too, was unreasonable.

# ARGUMENT

## I. The district court erroneously denied suppression because the detector dog, Fit, physically intruded onto Mr. Castro-Mendez's truck prior to the onset of probable cause, and the intrusion's information-gathering purpose made it a Fourth Amendment search.

### A. Review is de novo.

The factual findings underlying a suppression ruling are reviewed for clear error, while legal conclusions receive de novo review. *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023). The latter category includes the ultimate conclusion as to whether probable cause existed at the time of a search. *See Ornelas v. United States*, 517 U.S. 690, 697-99 (1996). It is government's burden to substantiate the reasonableness of any stop, arrest, or search initiated without a warrant. *Wright*, 57 F.4th at 530.

### B. Fit's trespass preceded probable cause and amounted to a search.

There are two principal ways in which law-enforcement action may effect a "search" within the meaning of the Fourth Amendment. The first is based in property rights; it holds that "[w]hen 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quoting *United States v. Jones*, 565 U.S. 400, 406-07 & n.3 (2012)). Second, a search occurs when police conduct invades a "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring).

This case implicates both the property- and privacy-based rubrics. Because the property rationale represents the traditional "baseline" for the search analysis, Mr. Castro-Mendez will start there. *Jardines*, 569 U.S. at 5. At that baseline, the question here is whether Agent Vera's use of Fit to sniff outside Mr. Castro-Mendez's truck crossed into "search" territory when the dog twice physically intruded onto that "effect" in her effort to trace the odor that piqued her interest to its source.

As shown below, the answer is "yes." Agent Vera testified that both of Fit's trespasses occurred during her "post-alert" endeavor to discover the point source of the alerted-to odor—by "continuing to sniff" various areas of the vehicle—and then convey that information to him through her trained indication. The agent accordingly confirmed that the unwanted physical intrusions had the investigative, investigation-gathering purpose necessary to accomplish a trespassory search. Before we get there, however, it is necessary to explain why the district court erred in pretermitting the baseline property analysis on the premise that Fit's instinctive "alert" behavior sufficed, on its own, to generate probable cause to search before the first trespass occurred. As discussed next, that premise is unsound.

**1. Fit trespassed before probable cause had arisen.**

Agent Vera testified that when Fit first made physical contact with Mr. Castro-Mendez's truck, she had already displayed her individualized change in body posture and respiratory rate that CBP defines as an "alert." Finding that testimony credible, ROA.90, the district court concluded that the fact that Fit became "alert" before the

first trespass meant that, search or not, the trespass was reasonable because the instinctual alert behavior had already aroused probable cause. ROA.89-92. The court grounded that ruling in several of this Court's prior decisions, which have held that the "alert" of a canine trained and certified to detect drugs and concealed persons is presumptively reliable, and thus suffices to generate probable cause to search the alerted-to area of a vehicle stopped for immigration inspection. *See United States v. Martinez*, 102 F.4th 677, 684-86 (5th Cir. 2024); *United States v. Dovali-Avila*, 895 F.2d 206, 207 (5th Cir. 1990).

Setting aside for the moment Mr. Castro-Mendez's contention that the sniff of such a dog is itself a search, *see infra*, Section II, this Court recently made clear that its prior cases used the term "alert" to refer to the behavior that CBP labels an "indication"—i.e., the behavior a dog is trained to perform in order to communicate that it has detected and located the source of a trained odor. *See United States v. Keller*, 123 F.4th 264, 266 n.1, 269 n.2 (5th Cir. 2024). *Keller* succinctly described the difference, explaining that, in the Border Patrol's unique parlance, detector dogs

> engage in two types of behavior when they encounter odors that they are trained to detect. An "alert" is an instinctual change in body posture that occurs when the canine first encounters a trained odor. The exact change in body posture is unique to each canine and may not be recognizable to every observer but is recognizable to the canine's handler. An "indication" is a trained behavior—such as sitting, pointing, scratching, or biting—that occurs after the "alert," when the canine detects contraband or people.

*Id.* at 266 n.1 (citing *Martinez*, 102 F. 4th at 682). *Keller* also clarified that the distinction is a meaningful one for purposes of the suppression inquiry:

> As noted above, nuances in the use of canine sniff-related terminology have led us to hold "that a drug-dog's alert is sufficient to create probable cause for a search" but that a "weak alert on its own" does not necessarily "trigger a search." Avoiding the problem of changing terminology, we clarify: A trained and certified dog performing its trained behavior is sufficient by itself to create probable cause for a search. A trained and certified dog exhibiting a distinct behavior that is innate or instinctive but not trained *may* create probable cause *in combination with other evidence or testimony supporting* the government's burden of proof.

*Id.* at 269 n.1 (quoting *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998) (first emphasis original; second added).

The rule that follows is clear: a Border-Patrol certified detector dog's trained "indication" suffices to generate probable cause to search the indicated-to area; but the same dog's instinctual "alert" does not suffice to create probable cause without other suspicion-arousing evidence or testimony. That rule also controls the question whether probable cause existed to search Mr. Castro-Mendez's truck before Fit made physical contact with the vehicle.

It did not. Agent Vera credibly testified that Fit started performing her instinctual "alert" behavior prior to propping herself up on the rear tire and bumper, but that she did not "indicate" until after those trespasses. He cited no other basis—apart from the "alert"—to suspect unlawful activity as of the first trespass on the rear tire. And the government presented no other evidence or testimony to that effect. Because

Fit's untrained alert behavior formed the exclusive basis for suspecting any illegality when she made contact with the vehicle, there was no probable cause to search as of that point. The district court accordingly erred in reaching the contrary conclusion.

#### 2. Fit's trespasses were searches because they had an investigative, information-gathering purpose.

As noted, a search occurs whenever government officials make an unwanted physical intrusion onto one of the places or things the Fourth Amendment protects—persons, houses, papers, and, as relevant here, effects—"for the purpose of obtaining information." *Jones*, 565 U.S. at 404. "It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment." *Ibid.* It is likewise clear that officers equally transgress the rule when they accomplish the trespass themselves—for instance, by "tapping" on a vehicle's tire to test if there was "something besides air" inside, *see United States v. Richmond*, 915 F.3d 352, 354, 357-58 (5th Cir. 2019)—or through the use of an investigative device or tool at their disposal—as with the small GPS tracker the agents in *Jones* installed on the defendant's Jeep. *See* 565 U.S. at 403-05.

As this Court has made clear, moreover, the degree of the nonconsensual intrusion is immaterial; it is the intrusion's "purpose" that matters: the "trespass 'must be conjoined' with 'an attempt to find something or obtain information.'" *Richmond*, 915 F.3d at 357 (quoting *Jones*, 565 U.S. at 408 n.5); *cf. Jardines*, 569 U.S. at 9-10 (explaining that the scope of an express or implied license to intrude likewise "depends upon the purpose" for the intrusion). That is why, in *Richmond*, the officer's

"relatively minor act" of tapping on a stopped car's tire "for a second or two" was a search "regardless of how insignificant [that contact] might seem." 915 F.3d at 358-60. The officer touched the tire in order to listen to the "resulting sound," and thereby "help [him] found out what was inside." *Id.* at 354, 357. And that information-gathering purpose distinguished the tire tap from the types of equally brief, "incidental" trespasses, such as "lean[ing] on the door of car while questioning its driver," that would not rise to the level of a search. *Id.* at 357. Here, there is no dispute that Fit physically intruded on Mr. Castro-Mandez's truck twice—first placing her paws on the rear tire to hold herself up to stand on two legs and sniff for a second or two, and then doing the same thing on the rear bumper for about five seconds—while he was detained for primary inspection. Though "relatively minor," those nonconsensual intrusions onto two of the truck's surfaces, including the same surface as was touched in *Richmond*, constitute a trespass. *Id.* at 358.

The question, then, is whether those trespasses had the requisite information-gathering purpose to make them searches under *Richmond*, *Jardines*, and *Jones*. In *Keller*, this Court found that the district court "did not plainly err in failing to conclude," sua sponte, that a detector dog's "placing of his paws on [the defendant]'s vehicle in the primary inspection lane was a search." 123 F.4th at 268. Mr. Castro-Mendez's contention that the trespass here amounted to a search, in contrast, comes before this Court fully preserved, and thus on a record developed with the pivotal question—was Fit's physical intrusion infused with investigative purpose, or a mere

incidental contact—firmly in view. As *Keller* noted, other circuits have held, on different records, that where a canine is shown to have placed its paws on a vehicle's exterior in the course of engaging in "instinctive actions," that is the sort of "incidental contact" that does not effect a search. 123 F.4th at 268; *see id.* at 268-69 (collecting cases).

But that is not the case here. In this case, Agent Vera, whose testimony is just as credible in this respect, made clear that Fit's acts of holding herself up on the truck's rear tire and bumper were done as part of her effort, after and separate from her instinctive "alert" behavior, to "trace" the odor she believed she had detected to the area of the vehicle from which it was emanating the strongest. ROA.201-02, 224-25. Under *Jardines*, that conduct—sniffing, and attempting to track an odor to its strongest point source—is unquestionably information gathering. 568 U.S. at 5-6. Because Fit physically intruded on the truck in pursuit of that investigative purpose, her trespass was a search.

As an initial matter, there is a key nuance here that is critical to highlight. Fit's instinctive "alert" behavior, as Agent Vera made clear, consists of the "change in body posture" and "increased respiration" (more rapid breathing) that results when she "first encounters an odor she is trained to detect." ROA.153; *accord* ROA.155, 170. But once Fit is on "alert," Agent Vera also established, her follow-on "tracing" activity is "different," and *purposeful*. Upon becoming alert, the handler testified, Fit starts to excitedly look for, or "trace," the source of the detected odor. ROA.224-

25. She is "continuing to sniff" throughout the tracing process. ROA.200. And she does this with a clear goal in mind: to obtain the reward—"her toy"—that her training has taught her she will receive upon locating an odor's source. ROA.201-02; *see* ROA.159, 173, 199.

That is, the handler himself confirmed that there is a clear difference between Fit's initial "instinctual" reaction to odor that CBP labels an "alert," and the purposeful, sniff-tracing behavior that she proceeds to engage in until finally performing her trained "indication." ROA.224-25 (explaining that the Fit's typical behavioral sequence is "alert[], trace, then indicate," and affirming that "tracing" is "*post-alert* behavior" in which Fit "is trying to find the source of what she's smelled or detected" (emphasis added)); *accord* ROA.154 (defining "tracing" as "post-alert behavior displayed by the K-9 when following the odor source"). And that is entirely on all fours (pardon the pun) with the Supreme Court's recognition, in *Jardines*, that a detector dog's act of sniffing for odor, as well as its "energetic" efforts to "track[]" a perceived odor to its "strongest point source," 569 U.S. at 4, are self-evidently investigative practices through which the canine, and thus, the police, "gather[] information." *Id.* at 5-6; *see id.* at 9 (describing detector dog's sniff as a "canine forensic investigation"); *see also State v. Organ*, 726 S.W.3d 346, 360-61 (Tex. Crim. App. 2025) (noting that "[t]he Court recognized in *Jardines* that the use of trained drug-dogs to investigate an area reveals an objective purpose to search or gather incriminating evidence"); *State v. Howard*, 496 P.3d 865, 382 (Idaho 2021) (observing that a dog's

"sniff" is "an activity that is self-evidently conducted for the purpose of obtaining information").

Agent Vera also established that everything Fit did after becoming "alert" to the odor she perceived—including using the rear tire, and later the rear bumper, to physically raise herself up to a more-elevated vantage point—was part of her effort to investigate, and ultimately uncover, the location where the odor was emanating from within the vehicle. The agent unequivocally testified that both physical trespasses onto the truck occurred during the "tracing" phase of Fit's behavioral sequence. ROA.200-01, 205, 225. And he made clear that Fit's goal in propping herself up on the tire and bumper, specifically, was to get "as close as possible" to "the bed of the truck" in order to "sniff what's in there." ROA.201-02; *see* ROA.200 (describing Fit as "mov[ing] her muzzle up" higher, "trying to see where [the odor's] coming from," and agreeing that she is "continuing to do her job"—i.e., "continuing to sniff," at the moment she is depicted on GE 1 (at 00:00:31) rising to hold herself up with the tire).

In this way, the handler's testimony established that the physical intrusion had the requisite investigatory purpose to make it a search: Fit propped herself up with her forepaws resting on the rear tire in order to gain a different vantage point from which to obtain information about what was within the vehicle—and specifically, where within the vehicle—in order to "pinpoint" the strongest source of the odor she perceived. ROA.202. Indeed, that is precisely what the video depicts. Fit, having

detected an odor and intent on finding its source, slowly and deliberately lifts up onto her hind legs to stand, places her paws on the tire to hold herself up, and sniffs the truck's bed from an angle she could not have accessed from the ground. *Watch* GE 1 at 00:00:29–00:00:32. And Agent Vera's testimony also attested to how useful the information gleaned during the tracing process can be to his own investigative efforts: when a dog indicates that the traced odor is coming from an area of the vehicle where no lawful passenger would be riding—like a sedan's "trunk," as opposed to the "back seat"—he has more reason to suspect that the dog has reacted to either a contraband substance, or a person whose unannounced presence is connected to unlawful activity. ROA.190.

The fact that Fit's trespass arose from purpose-driven behavior, had an investigative motive, and allowed her to "continu[e] to do her job" (ROA.200)—i.e., collect and parse olfactory information through sniffing—from a vantage point that she otherwise couldn't have taken, suffices to separate the trespass here from the types of incidental touches, or instinctual entries, that other courts of appeals have held do not amount to a search on different evidentiary records. In short, this case involves a physical intrusion onto the same "constitutionally protected area"—a personal vehicle—as *Jones*, 565 U.S. at 407, with the same law enforcement "tool[]"—a trained detector dog—as *Jardines*, 569 U.S. at 11. And, like in those cases, the intrusion allowed the tool, and thus, law enforcement, to "obtain information" they otherwise would have lacked. *Jardines*, 569 U.S. at 5; *Jones*, 565 U.S. at 407. Because this

canine's physical contact with this truck was infused with an investigatory purpose, it was a search. And because that search preceded probable cause, it was unlawful. The district court accordingly erred in failing to suppress the evidentiary fruit of that Fourth Amendment violation.

## II. Alternatively, the district court erred in denying suppression because Fit's training as a Border Patrol detector dog leads her to respond to the odor of lawful activity, and that rendered her sniff an unlawful "search" from the outset.

### A. Review is de novo.

The factual findings underlying a suppression ruling are reviewed for clear error, while legal conclusions receive de novo review. *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023). The latter category includes the ultimate conclusion as to whether probable cause existed at the time of a search. *See Ornelas v. United States*, 517 U.S. 690, 697-99 (1996). It is government's burden to substantiate the reasonableness of any stop, arrest, or search initiated without a warrant. *Wright*, 57 F.4th at 530.

### B. Fit's sniff was a search because, by virtue of her training, it is no longer uniquely limited to disclosing the presence or absence of unlawful activity.

The most basic principle animating the longstanding conception of the "probable cause" needed to effect a Fourth Amendment "search" is that it requires a "fair probability," in light of the "totality of the circumstances," that "*contraband* or evidence of a *crime* will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213,

238 (1983) (emphasis added). The alert—or, in the CBP's peculiar parlance, indication—of a well-trained drug detection dog, standing alone, presumptively satisfies this standard. *See Florida v. Harris*, 568 U.S. 237, 246-47 (2013); *United States v. Keller*, 123 F.4th 264, 266 n.1, 269 n.2 (5th Cir. 2024). As the Supreme Court has long recognized, that conclusion rests on the premise that "drug-detection dogs alert only to contraband," *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)—or, more precisely, only to the "odor" of contraband. *Harris*, 568 U.S. at 246 n.2. So long as the premise holds, a positive alert necessarily raises the requisite "fair probability" that "a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

All of this moves, however, from the antecedent assumption that "the canine sniff is *sui generis*," and does not itself constitute a Fourth Amendment search, because it "discloses only the presence or absence of narcotics, a contraband item." *United States v. Place*, 462 U.S. 696, 707 (1983). The suppression record here, however, undermines that assumption. Although Agent Vera established that Fit is well-trained and certified in detecting the odors she is conditioned to detect, he also made clear that Fit's training teaches her to alert to and indicate at the source of the odor of nonvisible humans. ROA.162-63. And the agent unequivocally testified that this means Fit will alert—correctly, according to her training—even to the scent of lawfully present passengers that "she can't see." ROA.193; *see* ROA.188-93.

Because the alert of a dog trained like Fit could be a response to a lawful passenger who is not hiding from inspection but is obscured from the dog's view—

like "a baby in a car seat," or "somebody taking a nap in the back seat" (ROA.190)—the sniff of such a dog can no longer be characterized as "disclos[ing] only the presence or absence of . . . contraband" or other evidence of illegal activity. *Place*, 462 U.S. at 707. Fit's sniff accordingly lacks the defining feature that led the Supreme Court to view "the canine sniff" of a dog trained to detect only illegal drugs as "*sui generis*" in comparison to other sense-enhancing investigation techniques deployed by law enforcement. *Ibid*; *see Caballes*, 543 U.S. at 409 (explaining that *Place* "treated a canine sniff by a well-trained narcotics-detection dog as '*sui generis*' *because* it 'discloses only the presence or absence of narcotics, a contraband item'" (quoting 462 U.S. at 707) (emphasis added)).

The Colorado Supreme Court reasoned similarly in holding that the sniff of a dog trained to detect marijuana "constitute[d] a search" in light of a state constitutional amendment that made it legal for adults 21 and older to lawfully possess that substance. *People v. McKnight*, 446 P.3d 397, 400 (Colo. 2019). As *McKnight* accurately noted, *Caballes* confirmed that the rationale for *Place*'s conclusion that a non-trespassory dog sniff is not a search is that, in theory, it only reveals the presence or absence of contraband, and "'governmental conduct that *only* reveals the possession of contraband compromises no legitimate privacy interest.'" *See id.* at 403 (quoting *Caballes*, 543 U.S. at 408) (original emphasis). In light of the constitutional amendment making it legal for adults in that state to possess marijuana in small amounts, the court reasoned, "a drug-detection dog that alerts to even the slightest amount of

marijuana can no longer be said to detect 'only' contraband." *Id.* at 408. "Thus, an exploratory sniff of a car from a dog trained to alert to a substance that may be lawfully possessed violates a person's reasonable expectation of privacy in lawfully possessing that item." *Ibid.* The potential for a marijuana-trained dog's sniff to "reveal lawful activity" accordingly rendered that sniff "a search." *Id.* at 410.

The same conclusion is appropriate in light of the potential for Fit's sniff to signal the presence of lawfully present passengers simply because they are not visible to her. Even at an interior immigration checkpoint, the lawfully present occupants of a vehicle possess a reasonable expectation that their personal belongings and closed containers inside the car will not be subject to official inspection merely because the dog who sniffed the vehicle could not see them. Because it may reveal the presence of odor connected to purely lawful activity, Fit's sniff invades a constitutionally cognizable privacy interest and was therefore a search. Because that search also preceded probable cause, it, too, was unreasonable and should have resulted in suppression.

The district court's reliance (ROA.86) on *United States v. Martinez*, 102 F.4th 677 (5th Cir. 2024), to reject that conclusion was misplaced. *Martinez* did not confront the argument pressed here. The defendant there challenged only "the adequacy of [the dog]'s training," on the theory that training the dog to alert and indicate to the scent of nonvisible humans, whose presence is not invariably illegal, materially lessened the reliability of the dog's reaction to a trained odor as a signal of probable

criminal activity. *Martinez*, 102 F.4th at 685. That argument was factual, not legal, as this Court made clear both in noting the "clear error" standard of review, *id.* at 683, and in concluding that the record below allowed the district court to plausibly find as fact that the canine was reliable even though trained on the odor of concealed humans. *Id.* at 686.

That is, the defendant in *Martinez* did not make the *legal* argument that the *Keller* defendant raised for the first time on appeal and that Mr. Castro-Mendez preserved and now renews before this Court: that the dog's capacity to reliably detect, alert to, and indicate the presence of lawful and unlawful odors alike undermines the rationale for treating her sniff as *sui generis*, and thus renders her sniff itself a search. Because that argument was neither pressed nor passed upon in *Martinez*, the *Keller* panel rightly acknowledged that it was open in this Circuit. *See Keller*, 123 F.4th at 268 (noting that "our court has not directly addressed whether a canine's sniff constitutes a search when the canine is trained to detect both lawful and unlawful activity").

The Court is accordingly free to address and resolve that argument (should it conclude that Fit's trespass did not rise to the level of a search). If the Court reaches this issue, it should hold that the sniff of a dog trained to alert and indicate even to the presence of lawfully present human odor is a search.

## CONCLUSION

For the reasons stated, the Court should vacate Mr. Castro-Mendez's judgment of conviction and sentence, reverse the denial of his motion to suppress, and remand for further consistent proceedings.

Respectfully submitted,

PHILIP G. GALLAGHER
Federal Public Defender
Southern District of Texas

s/ *Evan G. Howze*
EVAN G. HOWZE
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002
(713) 718-4600

## CERTIFICATE OF SERVICE

This brief was served upon counsel for the appellee by notice of electronic filing with the Fifth Circuit CM/ECF system.

s/ *Evan G. Howze*
EVAN G. HOWZE

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) & (f) because it contains 7,031 words.

2. This brief complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared with the current version of Microsoft Word software, Microsoft Office 365 edition, using the proportionally spaced, Times New Roman typeface in both the text (14-point) and footnotes (12-point).

3. This brief was filed electronically, in native Portable Document File (PDF) format, via the Fifth Circuit's CM/ECF system.

4. This brief complies with the privacy-redaction requirement of 5th Cir. R. 25.2.13 because it has been redacted of any personal data identifiers.

5. This brief complies with the electronic-submission requirement of 5th Cir. R. 25.2.1 because it is an exact copy of the paper document.

6. This brief has been scanned for viruses with the most recent version of a commercial antivirus scanning program and is free of viruses.

s/ *Evan G. Howze*
EVAN G. HOWZE